UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

LORI D. MCLAUGHLIN,

      Plaintiff,

v.                                    Case No:  6:12-cv-1168-Orl-28TBS

ERIC HHOLDER, JR., ATTORNEY
GENERAL, DEPARTMENT OF JUSTICE,

      Defendant.

_____

## REPORT AND RECOMMENDATION[1]

      Pending before the Court is Defendant's Motion for Summary Judgment. (Doc. 89).

Upon due consideration I respectfully recommend that the motion be GRANTED as to all

counts of Plaintiff Lori McLaughlin's Third Amended Complaint.

## I. Factual Background

      Since 2001, Plaintiff has worked as a Special Agent for the Bureau of Alcohol,

Tobacco, and Firearms ("ATF" or "the Agency"), an agency of the United States

Department of Justice.  (Def. Ex. 5, p. 5:14–16).  From 2002 until August, 2009, she

worked in the Agency's Orlando Field Office, which operates under the supervision of the

Tampa Field Division.  (Doc. 60, ¶¶ 9-12).  She brought this action against her employer[2]

alleging discrimination and retaliation in violation of Title VII of the Civil Rights Act of

1964, 42 U.S.C. § 2000e et seq., in the United States District Court for the District of

---

[1] Specific written objections to this report and recommendation may be filed in accordance with 28 U.S.C. § 636, and M.D. Fla. R. 6.02, within fourteen (14) days after service of this report and recommendation.  Failure to file timely objections shall bar the party from a de novo determination by a district judge and from attacking factual findings on appeal.
[2] Plaintiff's lawsuit names Attorney General Eric Holder, in his official capacity, as the defendant. For convenience and clarity, I will refer to the Defendant as "ATF" or "the Agency."

Columbia.  The case was transferred to this Court pursuant to 28 U.S.C. § 1406(a), and

the special venue provision in Title VII, 42 U.S.C. § 2000e-5(f)(3).

This is not Plaintiff's first employment discrimination lawsuit against the ATF.  In

2008, she sued the Agency in federal district court in the District of Columbia, for

discrimination and retaliation arising from various incidents between 2005 and 2008.  On

December 14, 2011, the presiding judge in that case entered an order granting the ATF

summary judgment on all claims except for Plaintiff's retaliation claim in connection with

the ATF's failure to give her a cash award for her work on the Disney Pipe Bomb

Investigation.  McLaughlin v. Holder, 828 F.Supp.2d 230 (D.D.C. 2011).  The court has

since vacated that order and requested another round of summary judgment briefs on the

retaliation claim as well as Plaintiff's claims that the ATF discriminated against her on the

basis of race and sex and retaliated against her in her annual performance evaluation for

2008.  McLaughlin v. Holder, No. 1:08-cv-01256 (D.D.C. April 19, 2013) (order vacating

summary judgment).  Supplemental briefing on summary judgment has been completed,

but no trial date has been set.

Plaintiff's Third Amended Complaint alleges that the ATF wronged her by (1)

denying her the Special Agent of the Third Quarter Award for 2006; (2) giving her a rating

of "5: Fully Successful" rather than "7: Outstanding" on her 2009 Performance Appraisal;

and (3) denying her the opportunity for career advancement.  (Doc. 60).  She avers that

these actions were motivated by discrimination on the basis of race and sex and in

retaliation for her prior complaints of employment discrimination against the Agency.

(Id.).  On July 25, ATF filed the pending motion for summary judgment.  (Doc. 89; see

also Docs. 90-92 (additional exhibits)).  Plaintiff, who was initially represented by counsel

but is now proceeding pro se, has filed a response in opposition to the motion.  (Docs. 98, 99).

## II. Legal Standard

A.  Summary Judgment

A party is entitled to summary judgment if it can show that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law. FED. R. CIV. P. 56. An issue of fact is "genuine" if the evidence is such that a reasonable jury could find the fact in favor of the nonmoving party and "material" if the fact "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Avenue CLO Fund, Ltd. V. Bank of America, N.A., 723 F.3d 1287, 1294 (11th Cir. 2013).

On a motion for summary judgment, the court must view the evidence in the light most favorable to the nonmoving party, drawing all reasonable inferences in that party's favor. Avenue CLO Fund, 723 F.3d at 1294 (citing Blackston v. Shook & Fletcher Insulation Co., 764 F.2d 1480, 1482 (11th Cir. 1985)). But, the court need not draw inferences based solely on speculation and conjecture. Id. And, the Court "must avoid weighing conflicting evidence or making credibility determinations," Stewart v. Booker T. Washington Ins., 232 F.3d 844, 848 (11th Cir. 2000), as it is the province of the jury and not the judge to assess the probative value of the evidence. Kennett-Murray Corp. v. Bone, 622 F.3d 887, 893 (5th Cir. 1980).

The party moving for summary judgment bears the burden of showing that no genuine issue of material fact exists.  Celotex Corp v. Catrett, 477 U.S. 317, 323 (1986); Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991); Watson v. Adecco Employment Servs., Inc., 252 F.Supp.2d 1347, 1351-52 (M.D. Fla. 2003).  The movant

may meet this burden in one of two ways: either by directly negating an essential element of the nonmovant's claim, or by showing that there is insufficient evidence in the materials on file for the nonmovant to establish its burden of proof at trial.  Clark, 929 F.2d at 608. When the moving party demonstrates an absence of evidence on a dispositive issue for which the nonmoving party bears the burden of proof at trial, the nonmoving party must then "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." Celotex Corp., 477 U.S. at 324-35 (internal quotations and citations omitted); Clark, 929 F.2d at 608.

   B.  Title VII

   Plaintiff's complaint alleges violations of both the substantive disparate treatment and anti-retaliation provisions of Title VII of the Civil Rights Act of 1964. Title VII's disparate treatment provision bars employers from engaging in "unlawful employment practices," including discriminating against employees based on "race, color, religion, sex, or national origin" with respect to the employee's "compensation, terms, conditions, or privileges of employment." 42 U.S.C. § 2000e-2(a)(1).  Title VII's anti-retaliation provision forbids "discriminat[ion]" against employees who have "opposed any practice declared unlawful [by Title VII] or . . . made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" under Title VII.  Id. § 2000e-3(a).

   A plaintiff alleging race or sex discrimination or retaliation in violation of Title VII's substantive provision may prove her claim by direct or circumstantial evidence.  When a plaintiff has only circumstantial evidence of discrimination or retaliation, burdens of proof and persuasion are allocated according to the framework set forth in McDonnell Douglas v. Green, 411 U.S. 792 (1973), and Texas Dep't of Community Affairs v. Burdine, 450

U.S. 248 (1981).  Under this framework, the plaintiff must first make a prima facie case of discrimination.  Burdine, 450 U.S. at 452-53.  To make a prima facie case, the plaintiff must establish that (1) she is a member of a protected class; (2) she was qualified for the job in question; (3) her employer subjected her to an adverse employment action; and (4) her employer treated similarly situated employees outside of her class more favorably.  Crawford v. Carroll, 529 F.3d 961, 970.

Once the plaintiff has established a prima facie case of discrimination the burden shifts to the defendant to offer a "legitimate, nondiscriminatory reason" for the action.  Burdine, 450 U.S. at 254.  The defendant's burden is one of production, not persuasion, Id. at 253, which the defendant must meet by putting forth an explanation for its action that, "if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action."  St. Mary's Honor Center v. Hicks, 509 U.S. 502, 507 (1993).  The plaintiff must then "demonstrate that the proffered reason was not the true reason for the employment decision," but instead a pretext for discrimination.  Burdine, 450 U.S. at 256.  The plaintiff may do this "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence."  Id.  "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.  Burdine, 450 U.S. at 253.

The same burden-shifting framework applies in retaliation cases, with two key differences.  First, to establish a prima facie case of retaliation, the plaintiff must show that (1) she engaged in statutorily protected activity; (2) her employer took adverse action; and (3) there was a causal connection between the protected activity and the employment action.  Crawford, 529 F.3d at 970.  Second, the plaintiff's ultimate burden of

persuasion requires showing but-for causation.  In other words, the plaintiff must prove that, but for her protected activity, the defendant would not have taken the challenged action.  Univ. of Texas Southwestern Med. Ctr. v. Nassar, 133 S.Ct. 2517, 2528 (2013).

### III. Analysis

#### A.  Special Employee of the Quarter

Plaintiff's first three claims arise from her failure to receive the Special Agent of the Third Quarter award for the year 2006.  The Special Agent of the Quarter award was a motivational award issued within the Tampa Field Division to employees who performed significant investigative work.  (Def. Ex. 3, ¶ 20; Pl. Ex. 17, p. 2).  The award was not issued every quarter and it was not part of the official Agency award program.  (Def. Ex. 3, ¶ 20).  In 2006, Plaintiff's former first-line supervisor, Resident Agent in Charge ("RAC") Russell May, nominated Plaintiff for the award for the third quarter of that year in recognition of her work on an investigation into weapon and drug trafficking through Puerto Rico.  (Pl. Ex. 17, p. 2; Pl. Ex. 20).  Plaintiff's nomination was never processed and she did not receive the award.  She contends that the failure to process her nomination and confer the award on her was due to race or sex discrimination or retaliation for her protected activity.

#### 1.  Discrimination

To establish a prima facie case of discrimination or retaliation, a plaintiff suing under Title VII must show that she suffered "adverse employment action." Davis v. Town of Lake Park, Fla., 245 F.3d 1232, 1238 (11th Cir. 2001).  "[N]ot everything that makes an employee unhappy is an actionable adverse action." Smart v. Ball State Univ., 89 F.3d 437, 441 (7th Cir. 1996); See also Davis, 245 F.3d at 1238.  Because Title VII is not "a general civility code" for the workplace, Gupta v. Fla. Bd. of Regents, 212 F.3d 571, 587

(11th Cir. 2000), only "materially" adverse conduct is actionable under Title VII. Burlington Northern & Santa Fe Ry. v. White, 548 U.S. 53, 69 (2006); Davis, 245 F.3d at 1238.

Different standards for materiality apply to substantive disparate treatment and retaliation claims. Burlington Northern, 548 U.S. at 69. To be actionable under Title VII's substantive provision, the employer's action must affect the "compensation, terms, conditions, or privileges" of the plaintiff's job, 42 U.S.C. § 2000e-2(a)(1), "in a real and demonstrable way," Davis, 245 F.3d at 1238. In other words, an employee must show "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Burlington Indus. v. Ellerth, 525 U.S. 742, 760 (1998). See also Davis, 245 F.3d at 1238 ("[The plaintiff] must show a *serious and material* change in the terms, conditions, or privileges of employment." (emphasis in original)). Allegedly retaliatory action is "material" when it "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Burlington Northern, 548 U.S. at 68. Because the anti-retaliation provision forbids any "discrimination" against employees based on protected activity, retaliatory conduct need not implicate hiring, discharge, or the "compensation, terms, conditions, or privileges" of employment to be actionable. Id. at 62-63; Thompson v. N. Am. Stainless, 131 S.Ct. 863, 868 (2011); 42 U.S.C. §§ 2000e-2(a), 2000e-3(a). Furthermore, "alleged acts of retaliation must be evaluated both separately and in the aggregate, as even trivial acts may take on greater significance when viewed as part of a larger course of conduct." Tepperwien v. Entergy Nuclear Operations, Inc., 663 F.3d 556, 568 (2d Cir. 2011).

In either case, materiality is an objective standard that must "be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances." Oncale v. Sundowner Offshore Servs, Inc., 523 U.S. 75, 81 (1998).  It excludes claims based on "petty slights [and] minor annoyances that often take place at work and that all employees experience." Burlington Northern, 548 U.S. at 68.  An employee cannot reasonably expect "immun[ity]" from these "'ordinary tribulations of the workplace'" simply for having engaged in protected activity under Title VII. Id. at 68 (quoting Faragher v. Boca Raton, 524 U.S. 775, 788 (1998)).

There is nothing in the record to indicate that the failure to award Plaintiff the Special Agent of the Quarter award had any effect (much less a material one) on the "compensation, terms, conditions, or privileges" of her job.  The affidavit of Assistant Special Agent in Charge ("ASAC") John F. Ryan, Plaintiff's second-line supervisor who worked at Division Headquarters in Tampa, states that the Special Agent of the Quarter award was simply a motivational award that was not regularly given out, and that the winner received, at most, a small plastic or acrylic trophy. (Def. Ex. 3, ¶¶ 20, 21).  The ATF has also submitted the declaration of S.B., a special agent based in Tampa who actually received the Special Agent of the Quarter Award for the Third Quarter of 2006, stating that he received only "a small plastic trinket that said 'Special Agent of the Quarter.'"  (Def. Ex. 4, ¶¶ 2-3).  The special agent did not receive money, time off, or anything else of value in conjunction with the award.  (Id., ¶¶ 3-4).  Plaintiff has not offered anything to controvert this evidence.  All she points to are two ATF vacancy announcements stating that applicants are evaluated on, among other things, awards they have received; a web page entitled "Vacancy Questions Preview" that includes a question about awards received; and Plaintiff's deposition testimony that the ATF

considers awards in evaluating promotion candidates.  (Pl. Ex. 15; Pl. Ex. 16, p. 126:9).

Action or inaction that merely makes an employee a marginally less desirable candidate

for a hypothetical future promotion does not amount to "adverse employment action" that

can support a Title VII claim for race or sex discrimination.  Hamilton v. Tex. Dep't of

Trans., 86 Fed. Appx. 8, 12 (5th Cir. 2004); Nurriddin v. Goldin, 382 F. Supp. 2d 79, 94

(D.D.C. 2005).  Accordingly, Plaintiff's race and sex discrimination claims based on the

denial of the award must fail.[3]

    2.  Retaliation

Plaintiff's retaliation claim presents a closer case.  Before Burlington Northern,

Eleventh Circuit law would have foreclosed this retaliation claim because Plaintiff could

not identify how failing to receive the award "altered the terms, conditions, or privileges of

her employment, deprived her of any opportunity, or adversely affected her status as an

employee." Crawford v. Carroll, 529 F.3d 961, 970-71 (11th Cir. 2008).   But–as the

Crawford panel recognized and the ATF concedes–that standard for retaliation claims is

no longer good law after Burlington Northern.  Id. at 973-74.  The test for adverse action

under Burlington Northern turns not on the impact on an employee's status but on

whether the action would have "dissuaded a reasonable worker from making or

supporting a charge of discrimination."  548 U.S. at 68.

The Burlington Northern court drew a line between "petty slights" or "minor

annoyances" on the one hand and conduct likely to dissuade "a reasonable person in the

plaintiff's position, considering all the circumstances," from reporting discrimination on the

---

    [3] In the D.C. case, the court reached the same conclusion in granting summary judgment for the ATF on a claim of discrimination arising from the Agency's failure to confer on Plaintiff the Department of Justice Community Service Award.  McLaughlin v. Holder, 828 F. Supp. 2d at 243.  The court dismissed Plaintiff's retaliation claim arising from the same action on other grounds.  Id. ("[Plaintiff]'s claim of retaliation must fail because she has not provided any evidence of causality and the time between her protected activity and the failure to nominate is too great to infer causality.").

other.  Id. at 68, 70.  To be entitled to summary judgment (at least on no-adverse-action

grounds), the ATF must show that no reasonable juror could determine that retaliatory

denial of the award crosses this line.  In Burlington Northern, the Supreme Court upheld

jury verdicts finding that (1) reassigning a female forklift operator to a more "arduous and

dirtier" task requiring fewer qualifications than her previous work, and (2) suspending her

pay for 37 days while under investigation for remarks allegedly made to male colleagues

constituted materially adverse action.  Id. at 70-73.  The conduct at issue here–failure to

confer a symbolic award–pales in comparison.  In its opinion, the Court cited with

approval the following example from an administrative manual published by the Equal

Employment Opportunity Commission ("EEOC"):

> A supervisor's refusal to invite an employee to lunch is
> normally trivial, a nonactionable petty slight. But to retaliate by
> excluding an employee from a weekly training lunch that
> contributes significantly to the employee's professional
> advancement might well deter a reasonable employee from
> complaining about discrimination.

Id. at 69 (citing 2 EEOC 1998 Manual § 8, p. 8-14).

Although it does not yield much insight about the application of the standard in

closer cases, Crawford represents the Eleventh Circuit's most extensive discussion of the

Burlington Northern decision.  The Crawford court held that an unfavorable performance

evaluation that adversely affected an employee's eligibility for a merit pay increase could

constitute "adverse action" for purposes of both discrimination and retaliation claims

under Title VII.  Id. at 974.  It rejected a district court decision dismissing the entire case

as "wrong under our prior, narrower standard, [and] most certainly wrong under

Burlington [Northern]'s more liberal standard."  Id.  The Court observed in a footnote, that

Burlington Northern "strongly suggests that it is for a jury to decide whether anything

more than the most petty and trivial actions against an employee should be considered 'materially adverse' to him and thus constitute adverse employment actions." Id. at 973 n. 13.

Eleventh Circuit decisions rejecting retaliation claims often focus on the lack of evidence of any harm to the Plaintiff.  See, e.g., Deprado v. City of Miami, 264 Fed. Appx. 769, 772 (11th Cir. 2008) (transfer from training unit to patrol unit not materially adverse, because employee "offered no evidence that the Patrol Unit job was more arduous or required more qualifications, or that anyone besides him objectively considered it a better job"); Morales v. Ga. Dep't of Human Resources, 446 Fed. Appx. 179, 183–84 (11th Cir. 2011) (bad evaluations or reprimands not materially adverse absent evidence of any possible future effect on an employee's salary or job status).  Additionally, an employee who fails to explain how the action would have negatively affected her cannot establish that the action is adverse.  Hall v. Dekalb County Gov't, 503 Fed Appx. 781, 790 (11th Cir. 2013).

Case law from other circuits supports the proposition that when an employee challenges an employer's failure to bestow an honor as retaliatory, the employee must produce evidence of some harm other than hurt feelings to survive summary judgment. In Zelnik v. Fashion Institute of Tech., 464 F.3d 217 (2d Cir 2006), the Second Circuit rejected a retired professor's claim that denial of emeritus status constituted adverse action.  Id. at 227.  The plaintiff in that case failed to show that an emeritus professor at his institution was afforded "any benefit or item of value beyond what is afforded to other faculty members" and offered no evidence (other than his own conclusory statements) that professor emeritus status at his institution "carries with it things of intangible value, such as prestige, status, and respect within [his institution] and [the] wider academic

community." Id.  Likewise, a federal district court in Delaware rejected "plaintiff's claims

regarding defendant's failure to post a certificate reflecting plaintiff being named

employee of the month," because "such actions are minor and cannot be considered

adverse employment actions."  Moore v. Staples, Inc., 635 F. Supp. 2d 337, 340 n.6 (D.

Del. 2009).

Viewing the evidence in the light most favorable to Plaintiff, there is no evidence

that the Agency's failure to give her the award for Special Agent of the Third Quarter for

2006 was anything more than a petty slight.   Plaintiff has not alleged or shown that she

was better qualified than the recipient to win the award.  And, apart from a cheap plastic

trophy, the winner received nothing of value.  The Agency's action may have hurt

Plaintiff's feelings but there is no evidence that it harmed her promotability.  There is also

no evidence that she applied for a promotion.  The record does not show that Plaintiff

suffered any real harm let alone an adverse employment action.  Consequently, the

evidence is not sufficient for a reasonable juror to conclude that denial of the Special

Agent of the Third Quarter award "might [have] deter[red] a reasonable employee from

pursuing a pending charge of discrimination or making a new one."  Crawford, 529 F.3d

at 973 n. 13, 974.  Accordingly, I recommend granting summary judgment on the grounds

advanced by the ATF.

B.  2009 Performance Evaluation (Counts IV-VI)

Plaintiff's next three counts allege that ATF discriminated against her based on

race and sex and retaliated against her for protected activity by giving her a rating of

"Fully Successful" rather than "Outstanding" for the year 2009.  (Doc. 60, pp. 20-26).

ATF evaluates its special agents annually based on their competence in sixteen

"critical elements."  (Def. Ex. 7, pp. C-1 to C-2).  These "critical elements" reflect the

knowledge, skills, and other characteristics the ATF expects special agents to demonstrate.  (Id.; Def. Ex. 8, ¶ 4).  For each critical element, an agent is rated on a 1-7 benchmark scale.  (Def. Ex. 7, p. C-2).  A score of 7 reflects "performance that is consistently of the highest quality," including "an exceptional quality of work with very little or minimal supervision, and where appropriate, work is completed significantly ahead of established schedules or deadlines and/or with a high degree of innovation."  (Id.).

Based on an agent's benchmark scores, the ATF assigns an overall rating, also on the 1-7 scale, and a summary rating of "Outstanding," "Successful," and "Unsuccessful." (Def. Ex. 7, p. C-2; Def. Ex. 6).  A special agent must receive a 7 on 80% of the critical elements to receive an overall rating of "Outstanding."  An overall rating of 1-2 is "Unacceptable" and is assigned when an agent receives an "Unacceptable" score on one or more critical elements.  (Def. Ex. 7, p. C-2).  All other agents are rated "Successful" and given scores between 3 and 6.  (Id.).  "Appraisals must be made in a fair and objective manner and shall reflect actual performance against the established written standards."  (Id., p. B-4).  ).  In addition, appraisals "shall include the proposed ratings and supporting narratives for each critical element, as well as the derived overall rating of record."  (Id., p. 3).  But, "[t]here are no guides that tell an evaluator objectively how to distinguish one benchmark from another" for each critical element.  (Def. Ex. 8, ¶ 8).

Normally, an employee's first-line immediate supervisor is responsible for preparing that employee's performance appraisal.  (Pl. Ex. 1, p. A-2 to A-3).  If the official rating the employee was not the employee's immediate supervisor for the entire performance appraisal period, then the official must obtain "written input from any previous supervisor" and take that input into account in preparing the appraisal.  (Id.).  A first-line supervisor ordinarily must be in place for at least 90 days to perform an

evaluation.  (Def. Ex. 7, p. B-7).  If a first-line supervisor leaves less than 90 days before the end of an appraisal period, the outgoing supervisor must complete the appraisal for subordinate employees.  (Def. Ex. 7, p. B-7).  A first-line supervisor who leaves more than 90 days before the end of an appraisal period is not required to complete performance appraisals.  (Id.).

On September 30, 2009—the last day of the 2009 ratings period—no permanent first-line supervisor had worked at the Orlando office since RAC May left in January 2009. (Def. Ex. 5, pp. 76:11-79:9).  For most of 2009, a series of acting supervisors were responsible for overseeing the Orlando Field Office.  (Id.).  The longest-serving of these was J.L., who was the acting supervisor from January through May 2009.  (Id.).  However, from May 2009 until the end of the FY 2009, no acting, first-line supervisor served for the required 90-day period.  (Id.; Def. Ex. 3, ¶ 8).  ATF policy does not specify who should complete a performance appraisal when no permanent (or sufficiently long-serving acting) first-line supervisor is in place for any of the last 90 days before the end of an appraisal period.  (Def. Ex. 8, ¶ 12).

In 2009, Plaintiff received a rating of 5, or "Fully Successful."  (Motion, p. 4; Doc. 99, p. 6).  She received benchmark ratings of 5 on ten critical elements, 6 on five critical elements, and 7 on one critical element.  (Def. Ex. 6).  Plaintiff received ratings of 5 in 2005, 2006, and 2007 and ratings of 6 in 2004 and 2008.  McLaughlin v. Holder, 828 F. Supp. 2d 230, 245 (D.D.C. 2011).  The 2008 rating was initially a 5, but was increased to 6 after Plaintiff met with her supervisor, RAC May, to discuss it.  Id. at 245 n. 6.  She has never, in her 10 year history as an ATF special agent, received an outstanding rating. (Def. Ex. 5, p. 118:7-8).  Of the 13 agents in the Orlando field office in 2009, five (J.L., S.P., J.W., K.M., and D.R.) received ratings of "Outstanding," one (B.P.) received a rating

of "Fully Successful/Outstanding," and seven received ratings of "Fully Successful."  (Def.

Ex. 12).  Eleven of the thirteen agents in the Orlando field office, including all six who

received ratings above "fully successful" were white men.  (Id.)  The only nonwhite agent

in the Orlando office in 2009 other than Plaintiff was R.Y., an African-American male.

(Id.).  Like McLaughlin and four white male agents, he received a Fully Successful rating.

(Id.).  The parties agree that ASAC Ryan completed Plaintiff's evaluation as well as the

evaluations of most of the other employees.  But, Plaintiff believes J.L. evaluated agents

R.Y., A.B., and J.D.[4]  (Def. Ex. 5, pp. 86:4-88:6; Def. Ex. 10).  Her suspicion is based in

part on the fact that J.L. is listed as the "owner" of R.Y.'s evaluation in ATF's computer

system.  (Id.).  The ATF has produced printouts, authenticated by the uncontradicted

declaration of ATF human resources employee Daniel J. Clark, showing that ASAC Ryan

input the evaluations and later transferred "ownership" to J.L.  (Def. Ex. 11).

   1.  Discrimination

   The ATF presents two arguments in support of summary judgment on Plaintiff's

discrimination claims arising from the 2009 evaluation.  First, the ATF contends that

Plaintiff has failed to make a prima facie case of race or sex discrimination because she

has not shown that similarly situated white or male employees were treated better than

her.  The ATF argues that the evidence shows the accomplishments, activities, and

performance of the agents who received outstanding ratings so set them apart from

Plaintiff that they are not similarly situated to her.  (Motion, pp. 20-21).  The ATF also

argues that, assuming Plaintiff has made a prima facie case, she has failed to show that

the non-discriminatory reason the ATF has put forward–that ASAC Ryan "based his rating

of [all of the agents] on criteria in the critical elements, using his own knowledge, the input

---

[4] Each of these agents received scores of "Fully Successful."  (Def. Ex. 12).

of others, and data to arrive at the number assigned to each element" was pretextual. (Motion, p. 22).

In substance, the ATF's two arguments are really the same.  The distinction between them is an artificial product of the <u>McDonnell Douglas</u> burden-shifting framework.  <u>Brockbank v. U.S. Bancorp</u>, 506 Fed. Appx. 604, 611 (9th Cir. 2013) (Ripple, J., dissenting).  The D.C. Circuit has jettisoned the prima-facie-case aspect of <u>McDonnell Douglas</u> for exactly this reason.  <u>Brady v. Office of Sergeant-at-Arms</u>, 520 F.3d 490, 494 (D.C. Cir. 2008) (characterizing the prima facie case as an "unnecessary sideshow"). Other judges have raised similar concerns. <u>See</u> <u>Coleman v. Donohue</u>, 667 F.3d 835, 863 (7th Cir. 2012) (Wood, J., concurring).  These cases convincingly argue that the summary judgment inquiry in Title VII discrimination cases really turns "on one central question: Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of race, color, religion, sex, or national origin?"  <u>Brady</u>, 520 F.3d at 494.  Because this is not the law of the Eleventh Circuit, I will address each of the ATF's arguments separately.

To make a prima facie case of discrimination, a plaintiff must show that one or more "similarly situated" employees not a member of her class was treated more favorably than she was.  <u>Wilson v. B/E Aerospace, Inc.</u>, 376 F.3d 1079, 1091 (11th Cir. 2004).  "The comparator must be nearly identical to the plaintiff to prevent courts from second-guessing a reasonable decision by the employer."  <u>Id.</u>

In responses to interrogatories, Plaintiff identified S.P., K.M., D.R., J.S., J.W., B.P., T.G, and D.R. as similarly situated agents treated better than she was.  (Def. Ex. 16, p. 2) Of these six agents, only S.P., J.W., K.M., and D.R. received outstanding ratings, so

Plaintiff has failed to make out a prima facie case as to the others.[5]  In many ways,

Plaintiff is similarly situated to these four agents.  She and the comparators were all ATF

Special Agents at pay grade GS-13 (Doc. 60, p. 13) who worked in Orlando during fiscal

year 2009.  At least S.P. and K.M, along with Plaintiff, were supervised during part of the

year by RAC May and part of the year by Special Agent and Acting RAC J.L.[6]  Most

importantly, ASAC Ryan evaluated Plaintiff and the comparators.

Despite these similarities, the ATF argues that S.P, J.W., K.M., and D.R. "are not

similarly situated 'in all relevant respects,'" because:

> "K.M. and D.R. had supervisory positions during the year.
> S.P. taught at the ATF Academy, trained two new agents, and
> had a number of significant activities.  J.W. was in charge of
> Operation Kissimmee Crackdown on which [Plaintiff] merely
> assisted and he was in charge of several other investigations
> despite having been in the office only a short time."

(Motion, p. 21).  This information is reflected in the performance evaluation summaries

(Def. Ex. 15), Plaintiff identifies as the basis for her position that she is situated similarly

to these other agents (Def. Ex. 16, p. 2).  The ATF argues that no reasonable jury could

compare Plaintiff's summary performance evaluation with these agents' summary

performance evaluations and conclude that they are similarly situated.  (Motion, p. 21).

This argument mischaracterizes Plaintiff's position.  Plaintiff contends that the

summary performance evaluation does not accurately reflect her accomplishments for

fiscal year 2009.  (Opposition pp. 5–6).  In particular, she objects to ASAC Ryan's failure

to give her credit for the TDK Tactical FFL Burglary Investigation and Operation

---

[5] At her deposition, Plaintiff stated that she believed she was discriminated against because J.L. rated R.Y. and possibly one or more other agents, but ASAC Ryan rated her.  (Def. Ex. 5, pp. 86:4–88:6). However, the ATF has produced uncontroverted evidence that ASAC Ryan in fact did all of the evaluations. (See Def. Ex. 11).

[6] D.R. arrived in Orlando from the Atlanta Field Division in February, 2009, after RAC May left for Philadelphia.  (Def. Ex. 15).  J.W. had a "short tenure" in Orlando, but the record isn't clear when he arrived. (Id.).

Kissimmee Crackdown.  (Id.).  Plaintiff has made a prima facie case by showing that both she and the comparators worked in the same job at the same office and were evaluated by the same person for the same time period.  A comparison of performance evaluations that are themselves allegedly the product of racial bias simply cannot un-make a prima facie case already made.

Whether Plaintiff has presented sufficient evidence to raise a jury question on pretext is a different matter.  To show pretext, Plaintiff must demonstrate "both that the proffered reason was false and that discrimination was the real reason."  St. Mary's Honor Center v. Hicks, 509 U.S. 502, 515 (1993).  The ATF asserts that ASAC Ryan "based his rating of [all of the agents] on the criteria in the critical elements, using his own knowledge, the input of others, and data to arrive at the number assigned to each element." (Motion, p. 22; Def. Ex. 3).  In other words, the ATF's position is that ASAC Ryan gave the agents the scores he reasonably believed they deserved, based on the established ratings criteria.  Plaintiff conceded at her deposition that she has no factual basis to claim that the agents who received outstanding or 7 ratings did not deserve that rating. (Def. Ex. 5, p. 164:17).  She contends instead, that the ATF's proffered nondiscriminatory reason is false because she deserved a 7, too.  All she offers to support her position is her subjective opinion, which is not enough to get to a jury.

Plaintiff makes an array of arguments in support of her claim, many of which focus on the ratings process rather than the substance of her evaluation.  Just as important as what Plaintiff argues in this case is what she does not argue–that she should have received a 7 on at least 13 of the 16 critical elements in her 2009 Performance Evaluation.  Neither her third amended complaint nor her opposition to the summary judgment motion address even one of her critical element scores.  At her deposition, she

stated that she believed the critical element scores were unfair because they did not take into account all of her work. (Def. Ex. 5, p. 166:11-14). But she only identified decision making[7] and teamwork and collaboration as specific areas where she was underrated. (Def. Ex. 5, pp. 153:9-154:3, 167:18-168:11). Plaintiff received a 7 on only one critical element (handling evidence/dangerous material),[8] so even if she had received 7's on teamwork and collaboration and judgment and problem solving, she would still have fallen well short of the requirement of 7's on 80% of the critical elements. To ask the jury to find that Plaintiff earned a rating of 7 or outstanding when she has not alleged or shown how she met the criteria to receive such a rating would be to ask the jury to sit as a "super personnel department." Chapman v. AI Transport, 229 F.3d 1012, 1030 (11th Cir. 2000). None of Plaintiff's arguments alter this result.

Plaintiff dedicates much of her opposition to argument about the evaluation process. In particular, she argues that ASAC Ryan failed to consult with or obtain information from RAC May or J.L. prior to completing her performance appraisal. (Opposition, p. 4). The facts surrounding ASAC Ryan's completion of performance appraisals for Orlando agents are somewhat hazy. Page 32 of Plaintiff's evaluation states that it was "based on input by RAC Russ May and RAC [J.L.]" (Def. Ex. 6, p. 22). Most of the performance evaluations summaries for the other agents contain the same boilerplate first line. (Def. Ex. 15).[9] At his deposition, ASAC Ryan stated that he

---

[7] Decision making is not one of the critical elements but judgment and problem solving is. (See Def. Ex. 6).

[8] Plaintiff received the following ratings on the critical elements: Knowledge of Administrative Procedure: 5; Judgment and Problem Solving: 5; Decisiveness: 5; Teamwork and Collaboration: 6; Plan, Organize, and Prioritize: 5; Communicate in Writing: 6; Communicate Orally: 6; Relate to Others: 5; Self-Management: 5; Knowledge of Relevant Laws, Regulations, and Policies: 5; General Investigative Knowledge: 6; Investigative Resources: 5; Handling Evidence/Dangerous Material: 7; Leading Others: 5; Advanced Investigative Knowledge: 5; Organizational Awareness: 6. (Def. Ex. 6).

[9] The exceptions are the evaluations of D.R. and S.P, which also appear to be significantly more thorough than the others. D.R.'s evaluation incorporates comments that appear to be written by his

"received a hodgepodge of input," both verbal and in the form of emails, from J.L. and

RAC May that he used in completing performance appraisals for the Orlando agents, but

that he didn't remember specifically "what input he used for what eval[uation]".  (Pl. Ex. 3,

pp. 349:22-351:6).  In a declaration attached to the ATF's motion, ASAC Ryan indicates

that he "took into consideration input and feedback I received from conversations with the

[first-line supervisors] and acting [first-line supervisors] throughout the year" as well as his

"knowledge of the day-to-day operations and work that was coming out of the Orlando

Field Office that I was aware of by virtue of my position as ASAC."  (Def. Ex. 3, ¶ 13).

But, when Plaintiff requested "all notes, documents, e-mails, diaries, calendars, or

materials of any kind created, received or used by ASAC John Ryan, RAC Russell May,

and A[cting] RAC [J.L.] in competing the Annual Performance Appraisal of Plaintiff for the

period ending September 2009," the ATF could not locate any responsive documents.

(Pl. Ex. 2).  And, RAC May, in his deposition, could not recall providing input for any of the

Orlando agents for the 2009 appraisals, although he did remember "a phone call or an

email asking [if he or J.L.] would contact each other regarding getting the evaluations

done."  (Pl. Ex. 4).

It is at best debatable whether ASAC Ryan solicited input from RAC May or J.L, or

obtained "written input" as required by the regulations.  Thus, the process may not have

complied with the ATF Performance Management and Recognition Order, which requires

a rating official to obtain "written input from any previous supervisor" prior to doing the

---

supervisor in Atlanta, where he spent the first part of the year, and by J.L. and RAC May.  At the end of the evaluation, ASAC Ryan states that that he "agree[s] with the above assessments. [D.R.] is a true professional with and [sic] excellent attitude and work ethic.  He is an excellent roll [sic] model to other agents in the division and is an asset to his group, the Division, and the Bureau."  S.P.'s evaluation states that it incorporates input from D.R. as well as J.L. and RAC May.  The evaluation summaries for both S.P. and D.R. run almost a full page in length, whereas the evaluation summaries for the other agents are shorter.  (Def. Ex. 15).  Plaintiff's contention that this was the product of race and sex discrimination and retaliation is implausible, given that most of the agents other than S.P. and D.R. are white males with no prior EEO activity.

ratings.  (Pl. Ex. 1, p. A-3).  But Plaintiff has not offered any evidence that ASAC Ryan did not use the same process to evaluate most, if not all, of the other special agents in the Orlando Field Office.  In light of Plaintiff's failure to show that she actually earned an outstanding rating, the manner in which ASAC Ryan performed the evaluations provides no basis for a finding either that the proffered non-discriminatory reason was false or that race or sex discrimination was the real reason for the evaluations.[10]

Plaintiff makes two other process-based arguments.  First, she faults the agency for failing to interview J.L. during EEO counseling.  However, even if the ATF's EEO counseling process was deficient, that is not relevant to ASAC Ryan's motivations in completing the 2009 performance evaluations.  Plaintiff also cites an entry in the ATF's privilege log that she claims shows that ASAC Ryan consulted with an ATF attorney before submitting her performance appraisal.  Assuming that the information contained in the privilege log could be admitted at trial to prove that ASAC Ryan spoke to an ATF attorney before submitting Plaintiff's evaluation, that fact does not show discriminatory motive, especially in light of Plaintiff's prior litigation against her employer.

Plaintiff's substantive objections to the evaluation largely center around her complaints that she failed to receive sufficient credit for the work she did in connection with two investigations: the TDK Tactical FFL Burglary Investigation and Operation Kissimmee Crackdown.[11]  Plaintiff states that she received no credit for the TDK

---

[10] If Plaintiff was concerned about the ratings process, and in particular ASAC Ryan's failure to consult with her direct supervisors, she could have disputed the rating using the ATF's internal grievance procedure, as she did in 2008 when her rating was increased from a 5 to a 6.  (Def. Ex. 5, pp. 113:17-116:18).  As her previous lawsuit shows, this would not have precluded her from suing over an evaluation she regarded as discriminatory or retaliatory.

[11] Operation Kissimmee Crackdown was a joint investigation by the ATF, DEA, Kissimmee Police Department, Osceola County Sheriff's Office, City of Orlando Police Department, and Florida Department of Law Enforcement.  It "targeted violent crime, as well as illegal drug and firearms trafficking, in the McLaren Circle area of Kissimmee, Florida."  Bureau of Alcohol, Tobacco & Firearms, Press Release, Kissimmee Crack Dealer Facing Mandatory Life Imprisonment (Feb. 26, 2009), available at

investigation in her 2009 Performance appraisal, even though she was assigned to be the "case agent" for the investigation.  (Opp. pp. 5-6).  Plaintiff alleges that R.Y., by contrast, was given credit for all eight defendants, and received a higher rating for those defendants than did Plaintiff.  (Id.).  She bases this contention on R.Y.'s performance evaluation, which states that he submitted two case reports with eight defendants.  (Def. Ex. 15).  The ATF responds that Plaintiff did not get credit for any of the TDK defendants because, although she initiated the TDK investigation, she transferred to Dallas before it was complete.  (Def. Ex. 5, pp. 138:11-140:23).  Plaintiff has not contradicted this evidence.  Instead, she points only to an email from R.Y. dated November 4, 2010, in which R.Y. recognizes her contribution to the investigation following the sentencing of one of the TDK defendants.  (Pl. Ex. 12).

Plaintiff also complains that she was not given credit for her work in Operation Kissimmee Crackdown and the Adrian Lamar Williams case.  (Opp. pp. 5-6).  RAC May assigned Plaintiff to Operation Kissimmee Crackdown to assist Special Agent J.W., who was the lead agent on the investigation.  (Pl. Ex. 4, p. 457:16; Def. Ex. 5, p. 32:9-22).  He testified that Plaintiff "helped [J.W.] get indictments" and went on approximately two of "literally dozens of operations." (Id. p. 458:7-10).  According to RAC May, Plaintiff would not have gotten credit for J.W.'s defendants in the case, and Operation Kissimmee Crackdown would not have been listed as a case for her.  (Id., pp. 457:21-458:4).  Nevertheless, Plaintiff's role on the case was appreciated by the United States Attorney's Office. On January 15, 2009, AUSA J. Bishop Ravenel sent a letter to RAC May commending Special Agents D.K. and Plaintiff for going "above and beyond the call of duty in investigating, preparing, and assisting the United States Attorney's Office in the

---

http://www.atf.gov/press/releases/2009/02/022609-tam-crack-dealer-convicted-on-drugs-firearms.html.

prosecution of Adrian Lamar Williams and in a number of the Kissimmee Crackdown

Cases." (Pl. Ex. 8).  The letter mentions McLaughlin's assistance during trial preparation

in "setting up witness interviews, following a variety of investigative leads, dealing with

uncooperative witnesses, [and] reviewing and marking evidence," and also helping

assure "during the trial . . . that the witnesses were available to testify at the appropriate

time." (Id.).  RAC May forwarded this letter to ASAC Ryan in early 2009.[12]  (Id.).  In

addition, Plaintiff has submitted an email from J.W. recognizing Plaintiff's contribution to

these cases.  (Id.)

Because Plaintiff failed to receive credit for these investigations, she was credited

in her evaluation summary with submitting two case reports for a total of five defendants.

(Def. Ex. 6, p. 32).  Plaintiff has not alleged, and there is no evidence, that other agents

were assigned reports or defendants on a different basis than she was.  There is no

evidence that any other agent was given credit for a case on which they were not the

primary agent (or at least co-agent) on the case, but instead assisted the primary agent or

agents.   Other agents were credited with reports and defendants as follows: R.Y., 2

reports, 8 defendants; A.B. 6 reports, defendants unspecified; K.M., 4 reports, 6

defendants; J.D, reports and defendants unspecified; S.P, 3 reports, 3 defendants; B.P.,

12 reports, 17 defendants; J.W., 12 reports, 17 defendants;[13] T.G., 3 reports, 6

defendants; J.S., 4 reports, 8 defendants; D.R., reports and defendants unspecified.

(Def. Ex. 15).  Of those special agents for whom a number of reports is identified, Plaintiff

---

[12] The letter from RAC May to ASAC Ryan is dated 2/4/2008; the Court assumes RAC May meant to date it 2/4/2009.

[13] The summary evaluation for J.W. is identical to that of B.P., except that the page numbers differ and J.W.'s name is substituted for B.P.'s in one location (though not others, so J.W.'s evaluation refers to B.P. in several places).  When Plaintiff pointed out this strange coincidence to the ATF, it responded that those were the 2009 evaluation summaries for J.W. and B.P. and that there were no other evaluations in existence for 2009.  (Pl. Ex. 15).  Obviously, there were errors in J.W.'s summary page, and there is reason to question the accuracy of these numbers but these questions are largely ancillary, given that ratings are determined by aggregating critical element scores and not counting defendants or case reports.

has the fewest reports (along with R.Y.).  The only agent with fewer defendants for whom a number of defendants is reported is S.P.  Of course, S.P. received a rating of outstanding.  On the other hand, J.S., a white male with more reports and defendants than both Plaintiff and S.P., received the same rating as Plaintiff: Fully Successful.  There appears to be little relationship between performance ratings and the number of reports or number of defendants.  Race or gender is utterly unhelpful in explaining the lack of correlation.  The non-relationship between rating and defendants turned over is, by all indications, attributable to the undisputed fact that the number of defendants an agent turns over for prosecution is not a critical element and does not factor directly into an agent's rating.  (Pl. Ex. 1; Def. Ex. 8, ¶ 5).  Accordingly, these statistics get Plaintiff no closer to showing that she deserved an outstanding rating.

Plaintiff has not explained, much less shown, why she deserved a rating of outstanding, she cannot prove that discrimination was the "real reason" she received a lower rating.  Because Plaintiff cannot show that discrimination was the real reason for her rating, she cannot meet her burden of proof on her race and sex discrimination claims.  Therefore, Defendant is entitled to summary judgment on these claims.

2.  Retaliation

The ATF asks the Court to reject Plaintiff's retaliation claim on the grounds that Plaintiff has not demonstrated a causal link between protected EEO activity and ASAC Ryan's evaluation.  (Motion, pp. 9, 21-22).  In support of this argument, the ATF points to McLaughlin's deposition, where she stated that she believed that her October 2009 deposition testimony in the D.C. case motivated ASAC Ryan's evaluation (Def. Ex. 5, pp. 130:14-112:18).  But, there is no evidence in the record that ASAC Ryan knew about the deposition.  (See Ex. 3, ¶ 19).  Plaintiff's answers to the ATF's interrogatories suggest

a broader basis for her retaliation claim, including her participation in informal EEO counseling up to August 2009.  (Def. Ex. 16, p. 1).  Furthermore, from Sept. 1, 2006 to the present, Plaintiff has been continually involved either in EEO counseling, EEOC proceedings, or federal litigation involving employment disputes with the ATF.

Even if Plaintiff could show that her EEO activity played a role in motivating her less-than-outstanding 2009 performance assessment, her retaliation claim fails because no reasonable juror could find by a preponderance of the evidence that Plaintiff's protected activity was a but-for cause of her receiving less than a score of outstanding. Univ. of Texas Southwestern Med. Ctr. v. Nassar, 133 S.Ct. 2517, 2528 (2013).  Plaintiff's burden of proving but-for causation is made significantly more difficult by the fact that she has never received an outstanding rating in her tenure as an ATF special agent.  To find in her favor on this count, a jury would have to conclude that, if not for her EEO activity, in 2009 she would have received the only outstanding rating of her career.  No reasonable juror could reach such a conclusion, given that there is no evidence to show that Plaintiff qualified to receive an outstanding rating in 2009.

C.  Denial of Career Advancement Claims (Counts VII-IX)

Plaintiff's last three counts allege that ATF discriminated against her on the basis of race and sex and illegally retaliated against her by denying her "any opportunity for career advancement."  (Doc. 60, ¶¶ 176, 187, 196, 207, 215, 228).  In her complaint, these claims are tied largely to the first six, as she alleges that, by denying her the special agent of the quarter award in 2006 and a performance evaluation of outstanding in 2009, "she would have been more likely to be reviewed for promotion" (Doc. 60, ¶¶ 181-82) and "the Agency would not have been so emboldened in its discrimination of [sic] Plaintiff."

(Id. ¶¶ 185–86).  These unspecified later acts of discrimination allegedly "forced" Plaintiff to relocate first to Texas and then to North Carolina.  (Id., ¶¶ 188–89).

In her opposition to the summary judgment motion, Plaintiff offers more detail, specifically pointing to the following incidents:

- In 2008, Plaintiff was refused a copy of her EEO complaint file, and had to file a Freedom of Information Act request, which produced only a heavily redacted copy of an EEO questionnaire.  (Pl. Opp. p 8).  When she transferred to Texas, she discovered that unnamed agents in the Tampa Field Division "planted" an unredacted copy of the questionnaire in her file "to ensure that the on-going discrimination/retaliation would continue against [Plaintiff] in the Dallas Field Division."  (Pl. Opp. pp. 8-9).

- In 2011, Plaintiff was the subject of an internal affairs investigation and was denied job benefits for 9 months while the investigation was conducted.  (Id., p. 10).

- In early 2012, Plaintiff applied to serve on the ATF's National Response Team, but was denied.  (Id.).

- In 2012, Plaintiff was denied the opportunity to perform as Acting Group Supervisor in the Dallas Division, and a less experienced agent was given the position instead.  (Id.)

- Plaintiff claims that continued discrimination in the Dallas office forced her to relocate to Fayetteville, North Carolina in November 2012.  (Id., p. 9).  In connection with her transfer to Fayetteville, Plaintiff alleges that ATF denied her request for administrative leave and delayed in processing her paperwork after the transfer.  (Id. p. 9).

Consistent with the general rule that Title VII plaintiffs must exhaust administrative remedies, Love v. Pullman Co., 404 U.S. 522, 523 (1972), a federal employee must first seek relief from the agency that allegedly discriminated against her before suing the government in federal court.  Brown v. Gen. Servs. Admin., 425 U.S. 820, 832 (1976). EEOC regulations provide for a counseling process to facilitate internal investigation and informal resolution of employment discrimination claims.  See 29 C.F.R. § 1614.105.   To initiate this process, an employee must make contact with an EEO counselor "within 45 days of the date of the matter alleged to be discriminatory."  Id. § 1614.105(a)(1).

The EEO counseling process constrains the scope of any subsequent litigation.  "A plaintiff's judicial complaint is limited" to matters that "can reasonably be expected to grow out of" the investigation into the charges raised.  Mulhall v. Advance Security, Inc., 19 F.3d 586, 589 n. 8 (11th Cir. 1984).  Thus, a Plaintiff may not make claims arising out of new and unrelated discriminatory or retaliatory conduct.  Gregory v. Georgia Dep't of Human Resources, 355 F.3d 1277, 1279-80 (11th Cir. 2004).  That said, "[c]ourts are . . . 'extremely reluctant to allow procedural technicalities to bar'" Title VII claims, and "'the scope of an EEOC complaint should not be strictly interpreted.'"  Id. (quoting Sanchez v. Standard Brands, Inc., 431 F.3d 455, 460-61, 65 (5th Cir. 1970)).  Put another way, a plaintiff is not confined to the four corners of her formal administrative complaint.  Claims that "amplify, clarify, or more clearly focus" the charges made at the administrative level are permissible.  Wu v. Thomas, 863 F.2d 1543, 1547 (11th Cir. 1989).  The ultimate question is whether the plaintiff's claim "was like or related to, or grew out of, the allegations contained in her EEOC charge."  Id.

Most courts hold that failure to exhaust administrative remedies is an affirmative defense that the defendant must plead and prove,[14] though case law in this Circuit is not entirely clear or uniform on this point.  See Goodridge v. Astrue, No. 1:07-CV-1918-RLV-RGV, 2008 WL 8691093 (N.D. Ga. Mar. 20, 2008).  Assuming ATF has the burden of proving non-exhaustion, it has met its burden as a matter of law.  The ATF has attached to its motion Plaintiff's formal EEOC complaint, which identifies two issues: the failure to confer the Special Agent of the Quarter Award and the allegedly discriminatory performance evaluation.  (Def. Ex. 1).  The ATF has also provided the letter accepting Plaintiff's EEO complaint, identifying the same two issues.  (Def. Ex. 2).  This letter also informs Plaintiff of her opportunity to correct any misidentified claim as well as to amend her complaint before the conclusion of the investigation "to include issues or claims like or related to those raised in this complaint."  Id.  Plaintiff has presented no evidence that she availed herself of either of these opportunities.  The administrative-level materials she has provided focus narrowly and almost exclusively on the Special Agent of the Quarter Award and the 2009 performance evaluation, and do not mention the subsequent issues she has raised in this litigation.  (Pl. Ex. 5, 17, 18, 36, 38).[15]  Moreover, Plaintiff has admitted that she did not raise failure to receive any promotion or denial of career advancement in her EEO complaint.  (Def. Ex. 5, p. 197:23 -198:5).  Accordingly, the ATF is entitled to judgment on Plaintiff's denial of career advancement claims.

---

[14] Laouini v. CLM Freight Lines, Inc., 586 F.3d 473, 475 (7th Cir. 2009); Kraus v. Presidio Trust Facilities Div./Residential Mgmt. Branch, 572 F.3d 1039 (9th Cir. 2009); Miles v. Bellefontaine Habilitation Center, 481 F.3d 1106, 1107 (8th Cir. 2007); Williams v. Runyon, 130 F.3d 568 (3d Cir. 1997); Bowden v. United States, 106 F.3d 433, 437 (D.C. Cir. 1997);

[15] Indeed, some of the conduct she complains about–in particular, the denial of her NRT application, the failure to make her Acting Group Supervisor, and paperwork-processing delays and denials in connection with her transfer to Fayetteville–could not possibly have been exhausted because they occurred after July 25, 2011, the date the EEOC dismissed her complaint.  (Doc. 60, ¶ 9).  Others appear to be the subject matter of a pending EEOC proceeding.  (Pl. Ex. 32).

## IV. Recommendation

Upon consideration of the foregoing, I respectfully recommend that Defendant's

Motion for Summary Judgment be **GRANTED** as to all Counts; that judgment be entered

for Defendant; and that the Clerk of Court be directed to close the file.

**RESPECTFULLY RECOMMENDED** at Orlando, Florida on November 27, 2013.

_____
THOMAS B. SMITH
United States Magistrate Judge

Copies furnished to:

    Presiding United States District Judge
    Plaintiff
    Counsel of Record